Richard Zielinski and James Hume for the Defendant Appellant Bruce Shear. I'd like to reserve if I may five minutes for my rebuttal. You may. Bruce Shear appeals from an unprecedented order of the District Court, and I use that term literally, an order that both affirms the jury verdict in his favor, but nonetheless ordered him to disgorge $3 million, even though the jury found that there was no injury and no fully proven tort against him. In fact, neither plaintiff nor us could find a case in which a court had done anything like this. The order should be reversed because in the absence of any injury or detriment under Massachusetts law, there can be no basis for a disgorgement. There are actually two key reasons I'd like to cover today on why the disgorgement order should be reversed. First, as I said, the jury found specifically in response to jury question number three that Maz did not prove the complete tort of breach of fiduciary duty under Massachusetts law. That tort has four elements, the last of which are that the plaintiffs suffer a harm or loss caused by the defendant. And on that answer, the jury found for the defendant and found that there was no injury or loss caused by the defendant. The second basis on which the disgorgement order should be reversed is the Tucci rule, as I'll call it, which the Supreme Court held that cases of this nature, shareholder suits, must be brought derivatively under Massachusetts law in a departure from the Delaware law. And they announced that they were not following Delaware law. Well, they would not follow Delaware law, but they should be brought derivatively with certain exceptions. With two exceptions, yes. The question is here whether this comes within one of the exceptions. The exception that the court noted that the minority shareholder, who is also a director, proposes and implements a self-interested transaction that is to the detriment of the minority shareholders, a direct action may proceed. But that is the exception and not the rule. And we believe here the case was not within the exception. How was it within the exception? One, Mr. Scheer did not implement a self-interested transaction. He was, in fact, a minority shareholder himself. He negotiated the exception? He did negotiate, but that's not what the court means by implementing it. In the Tucci case itself, Mr. Tucci had negotiated the merger. And if you look at the facts that were alleged in Tucci, it came up when they motioned to dismiss. Mr. Tucci had been set to retire. He had been no longer an activist investor. It's alleged that he stayed on, and as a result he reaped a $27 million change in control payment, and that the board sat idly by while he negotiated this merger with his good friend Michael Dell, and the board just rubber-stamped what he did. Those facts are actually far worse than what is alleged to have occurred in this place or even Mr. Scheer, who negotiated the transaction, but abstained from the board of directors vote. Counsel, if I may. So you think that under the Tucci case, he's not a controlling shareholder. Discussing the differences in the cases isn't all that helpful to us. Identifying the criteria which you think are relevant to the question of who is a controlling shareholder under Massachusetts law would be helpful to us. We believe that the Massachusetts controlling shareholders, and you have really two cases, are Coggins and the Tucci case. In both of those cases, the court analyzed it as the majority shareholder, and indeed, right after stating the exception, the court by one's observe, this is also not a transaction proposed by a director majority shareholder that affects minority shareholders adversely. Okay, so under your view, unless there is a majority shareholder, he cannot be a controlling shareholder no matter what the other facts? For the purpose of the Tucci rule, right, it means that any claim against him would have to be brought derivatively and not directly. So it's a binary switch. That's right. And in fact, even in Delaware, they recognize that controlling shareholders are majority shareholders are controlling shareholders, and then they have recognized some exceptions. But we think that the court in Tucci was so clear that they're not following Delaware in this area, that for the purposes of Massachusetts law, that a controlling shareholder, for the purpose of the Tucci rule, any Tucci exception, if you read it, it's all framed in terms of the majority versus the minority. Well, I have read it, and Tucci certainly doesn't have any requirement that a controlling shareholder be a majority shareholder. And I'm struggling with the notion of whether such a rule would make any sense, because certainly we can all conceive of situations, leaving aside the question of whether this is such a situation, we can all conceive of situations in which someone who is not a majority shareholder has such a degree of control and indeed dominance over a corporation that he should be treated as a controlling shareholder. There could be, I suppose. So I'm very resistant to your idea that we should put in a flat requirement that controlling shareholder criteria one must be a majority shareholder. Well, there certainly has to be greater elements of control than we're demonstrating here. There certainly has to be an element of control. Otherwise. Greater than is true in this case. Why do you say it has to be greater than in this case? Because the element of control in Tucci was in fact greater in this case. And if Mr. Tucci were not deemed to be a controlling shareholder, and he was not sued for being a controlling shareholder, and I'm sure we can assume that the plaintiff bar, had they thought that they had a claim against him as controlling shareholder, would have brought it. My crystal ball is pretty foggy. I can't assume that at all. What I do know is that Scheer had the power to block any transaction because he completely dominated the class B shares. He had effective control by virtue of his own admissions and statements over the board and over the corporation. And I'm struggling with the notion of short of a flat rule that he had to be a majority shareholder of why he wouldn't be a controlling shareholder. Well, I think the key here is that he did not have any ability to control the vote on the merger. And in fact, since it took two-thirds of the class A shareholders, one-third of them could have disapproved this merger. And of course, the terms of it, there was full disclosures found by the district court here. And the shareholders voted overwhelmingly. And we think if you read Tucci and you read Coggins, the focus of the court there is to protect minority shareholders who cannot control the outcome of the vote. And that's not the situation that we have here. And that's why we argue that the exception should not apply. I would briefly like to cover my first point and direct the court to Amtrak versus Viola because we think that case is actually on all fours with this one. That is one where Amtrak sued Viola for aiding and abetting a breach of fiduciary duty by its employees. And in fact, the jury found that Viola had but awarded no damages. Amtrak then did exactly what the plaintiffs tried to do here. They asked for an order of disgorgement from Viola. And the district judge there in that case found three reasons why they were not entitled to it. First, the jury's finding on causation closes the door to disgorgement. Second, contrary to the assertion, there was no harm from the finding of breach of fiduciary duty or aiding and abetting it because of the jury's finding. And in fact, the third, that there was no finding by this jury in this case that the Class A shareholders would have gotten any part of that Class B premium that was paid to Mr. Scheer.  That was the testimony of Mr. Kappenman. Can you just tell me that case again? It's National Passenger Railroad Corporation. I was using the common name for Amtrak versus Viola. It's in our brief. It's discussed there. It's a decision from the district court in Washington, D.C. Thank you. And I would say on this point, the court picked $1.82 million as the amount that was proper. That was actually argued to the jury and rejected by the jury. If you look at 9-99 of the trial transcript, which is the closing arguments, you will see the plaintiff specifically told the jury, you can put zero, you can put the median, which is the $1.82 million, or you can use some other number. What significance does that have? The district court made it clear that she was not making this award based on perceived loss. Here she had a situation where the jury has already found that the plaintiff suffered no economic loss. She didn't contravene that. But here she's got a situation where your client, in her view, received an unjustified gain, and she's decided that someone's got to receive the benefit of this windfall and that equity, because she was applying an equitable remedy, made it dictated that that gain go, at least in part, to the innocent Class A shareholders, rather than be retained by the parties she viewed as the malefactors. And the irony here is, Your Honor, that that resulted in a recovery that was twice what the class would have received had it prevailed on its claim in the first place. Maybe. But she wasn't measuring it by that. She was measuring it by what she viewed as the ill-gotten gains of the defendant. But the essence of disgorgement is to return something that someone had or would have gotten, and that is totally missing from this order. That's another defect. So that someone who receives... I understand you dispute whether this bonus payment to the Class B shareholders was unjustified, but someone who receives an unjustified bonus payment is allowed to keep it so long as there is no economic injury to his fellow shareholders? The jury did not find it to be unjustified. Well, the jury didn't find it, but we've got a district judge here exercising equitable jurisdiction. If the jury findings were the end of the matter, we wouldn't be here on this set of issues. After the verdict, there was no claim against Mr. Scheer. In all the cases the Court recited, there was a finding of fraud or conversion, or in the attorney's case, injuries presumed. That's totally absent from this case. That goes to your argument that disgorgement was not a proper remedy in the first place. That's correct. It was never intended to be. The post-trial equitable remedies were going to be to implement questions 6 and 7 of the jury verdict that appeared in the joint appendix of page 501. If you look there, question 7 was going to be a percentage. The Court was going to have to equitably convert that into a number or number of shares or something. It wasn't self-effectuating. That was what was intended, had we gotten that far with the verdict, for the Court to do something post-trial in an equitable enforcement. But there was never any intention, from our point, that having won the case with a verdict and a judgment for the defendant, that the Court could then equitably do something that was contrary to the verdict. We don't think there's any precedent for that. I see I'm over my time. I'll submit all remaining issues and reserve the rest for Bob. Thank you. Mr. Waldman, good morning. Good morning. Jeff Waldman for the Cross Appellate MAZ Partners. It's not what I was planning on doing, but because counsel raised a few issues, let me attack them right away. First of all, he says under 2G that this should have been a derivative action, not a direct action. Absolutely incorrect. Plaintiff's action is not derivative, under any definition of derivative, because different classes of shareholders were treated differently. As Judge O'Toole, who was the first judge, noted on the motion to dismiss, plaintiff's claim is directly derivative because the, quote, class A shareholders alone suffered the injury, period, close quote. And that is a point that's emphasized in 2G itself. In 2G, the court said it was not faced with a transaction in which one class of shareholders was treated adversely. That is at 2G70 and E3 at 922. So it was distinguishing itself from this very case. There's no way this is a derivative action. Shareholders were treated differently. That's the first point. The second point on 2G is this majority versus the controlling shareholders. There was one last question. I'm sorry. I actually thought the 2G issue turned on this question of controlling, the controlling shareholder. You seem to be suggesting we should take a different view that per se an action involving two different groups of shareholders, only one of which is injured. Absolutely. 2G says it. It says this case is different because there's not two classes being adversely affected. But let's attack the second point that he's making. No, I'm not ready to leave the first point. What does Delaware law say on that point? It's a direct action. It's not a derivative action. The Toomey case is the Delaware case that deals with it. That's just assured. That's not a question. This is not a derivative action. The second question is what he's also suggesting is that a controlling shareholder can be a majority shareholder. Must be. Must be a majority. No Massachusetts case has ever held that. Nor can we cite one case from anywhere else in the United States where a court has held that. But Delaware has numerous cases, as Chief Judge Sarris pointed out in her opinion, where clearly that a non-majority shareholder can be a controlling shareholder. In fact, the Senate and Delaware Supreme Court case, Tom V. Lynch, which really came up with the entire fairness test, or refined that test, was a non-majority shareholder controller. I also want to cite you the Coggins case, which you referred to. The Tucci Court specifically and favorably cited the Coggins case. In discussing why the burden of proof in the entire fairness case is always on the controlling shareholder, the case said, and I quote, if I can turn a page here, sorry, this is really bad, but it says, in connection with the sale of companies on the controlling stockholder, the Coggins court said, especially is this true where a common director is dominating an influence or character. That is, Coggins at 397 Mass at 533. Now why would the Coggins court go out of its way to say that the burden is on the controlling shareholder, especially when it's dominating, if this is simply a math test. According to the defendant's position, if I have 50.0% of a company, and I am threatening my careers, and I dominate, I have no duties to the shareholders. But if I have 50.0%, I'm a teddy bear. I let them do whatever they want, and I never make a trouble. I'm saddled with the shareholder responsibility. Are you suggesting there could be a majority shareholder who is not a controlling shareholder? No. A majority shareholder is always a controlling shareholder by definition. And if that's so, the term controlling shareholder, it would seem to me, has to mean something besides majority shareholder. Exactly. It is absolutely true that every majority shareholder is a controlling shareholder, but not every controlling shareholder is a majority shareholder, when you've never used that term. Why would they use the term? It makes no sense. It would be just redundant. And as I looked at Coggins, and I just cited you to that piece, why is it making a distinction? If you don't, that especially matters. It's relevant. So that's the two-chee. I'm somewhat mystified that the counsel keeps referring to this V-O case to support him on why the court can't issue relief where there is no damage award. V-O expressly found that plaintiffs are not required to show injury in order to discourage and defend its ill-gotten profits. C-886-F2 at page 17. Thank you, but counsel keeps signing cases at us. We're trying to figure out the logic, the reasonable way to approach these problems. He's basically said, look, the jury verdict should have constrained the district judge. She should not have felt free to enter a disgorgement remedy here. Can you just address that? Sure. It's wrong. Massachusetts cases, and Judge Kitsaris cited many of them, Beresford-Berlstein, the Kelly v. CBS, the DeLuna's case, the Coggins, another case. Nowhere in none of those cases was damage was found or injury to the plaintiffs. But in each case, they were awarded an equitable remedy. In fact, one of the main cases relying on my defendants, but actually Chief Judge Kitsaris, for the four elements of a breach of fiduciary duty case, is the Hanover case. Over at Hanover, the jury returned a verdict against a breach of fiduciary duty. Plaintiffs didn't prove it. But the court directed verdict for the plaintiff on a fiduciary duty claim, said there's no damage, and awarded equitable relief. Constructive trust, nominal values, attorney fees. That's the case they cite to say this could never happen. Well, it happened in your case. It happens all the time. And it's a very simple point. Under Massachusetts law, one of the essential principles of equity is that a fiduciary cannot profit from a breach of their duty. Now, another thing he said is throughout their papers, they continually could confuse the difference between the equitable remedy of restitution and the equitable remedy of disgorgement. That clears up half of this stuff. And let me use the Kelly v. CBS example that Chief Justice Gans of the SJC used. And that was the attorney by ultimate account. A plaintiff settles a case, has a million dollars. The attorney takes the million dollars, invests it in a hedge fund, and makes two million dollars. He then puts back the million dollars, and no harm. However, as the Chief Justice said in that case, you have to disgorge it. You can't benefit from the breach of a fiduciary duty. Now, let's flip it. What happens if you took that money, put it in a hedge fund, and lost the money? Now, we're talking about restitution. He has to put the money back. He has to pay that. Now, the feds keep pointing to windfall. The plaintiff's got a windfall. Again, we're looking at this the wrong way. In a restitution situation, we're looking at whether the plaintiff got a windfall, because all they're entitled to is their money back plus interest. Nothing more. But in a disgorgement situation, we don't care about windfall to the plaintiff. We care about windfall to the defendant. The defendant can't profit from his wrongdoing. And that's a fundamental mistake that is being made. What if you receive money for a situation in which you haven't had any damages, a windfall? Why is it not a windfall? If you haven't received damages, any money you get is money that you received no harm for. That's correct. Isn't that a windfall? And that's what happens. We do not prove the legal claim. However, a court sitting in equity tries to stop the fiduciary who breached his duty from profiting. So he is disgorged to the person who was the beneficiary or the fiduciary. That's what all the cases that Chief Judge Saras said. They're right on point. That's how we deal with it. Chief Judge Saras had not given it to the shareholders, but had put it in a CPRA fund of some sort to ensure that there's a lot of education on corporate law. That was one of the things she considered. She considered such a thing. She ultimately decided that the class that did not vote in favor of this transaction and who prosecuted it, the Little Red Hen argument, was entitled to it because it certainly wasn't going to sheer. Could she have done that equitably? Yes, but in this case, remember, the jury specifically found that a controlling shareholder breached his fiduciary duty and negotiated a merger that was unfair to the Class A shareholders. She gave effect to what the jury found. That's why she gave it to them. They also make an argument about evidence about how the admission of evidence after the transaction as to the value of the shares going up as a result of the transaction. Would you like to address that? Yes, that's our argument. That's your argument? That's our possibility. Okay. What we are arguing is it is impossible to take an event that occurs four years after a merger and say that that information was a basis for the director's decision to enter into the merger. It cannot be. In fact, the question, as Chief Judge Salas phrased it when she let it in, was to show why the PHC board opted to negotiate for a larger percentage of the equity in the resulting company. That's the identity on page 25. Now, how can something unrelated to a specific person occur independently for the first time four years later? Answer A provides the basis for why somebody did something. And also, how does it answer why the decision by that person was made? It was just pure error. It isn't relevant. It cannot be by the definition of logic. Mr. Baldwin, at one point in the brief you referred to that as an alternative argument. That's the word you used, alternative. Do I glean from that that it's an argument you don't press if you retain the disgorgement award? Well, we actually are. There were two types of reliefs we asked for. One was the disgorgement of the class being paid. The other was the actual equity. What I'm driving at is, hypothetically, were we to find in your favor on the defendant's appeal, do we then still have to resolve the cross-appeal? We believe yes. Okay, so that answers my question. Be careful about using the word alternate in an appellate court. We only decide what we have to decide. Okay. And so you say because of this purported error in the admission of testimony, you are entitled to a new trial. As to the exchange ratio. Because the prejudice that happened from that, and just think of it, and I think of, I had a picture in my office, where you had a jury with their hair standing on edge in their mouths agape, and the caption was, the jury will disregard that last remark. They can't unsee, once they're told that the merger price was $10 to $15 per share, and then say, but if you held it, you had the shares, it was worth over $85 per share. How are they wrong? How do they have economic loss? I'm actually just following up on Judge Selliot. You would say you're entitled to keep the discouragement and have a new trial on this other issue? Correct. It would be a lonely trial solely on the exchange ratio issue, which we think frankly would be about a two-day trial, where it's a battle of the experts as to whether the exchange ratio is fair with one or two other witnesses that had substantive information on that. And that no evidence as to what happened in the future could be admitted at that trial? Correct. That would be right. Okay. And I guess I will, if you don't have any questions, I will stop there. Thank you. Allow me to address the last question first, and that is the stock price information. The court's absolute view on the abuse of discretion standard. And Judge Sarris got the admission of it exactly right. She cites several Delaware cases that held that post-merger financial data is admissible to show that the plans in effect at the time of the merger had borne fruition. And in fact, the plaintiffs launched a violent attack on the structure of this merger and the negotiation of it and the equity ratio. And the directors, their documents at the time showing the sole reason for doing this, the main reason, was because the stock price of PHC had been flat for 10 or 20 years. And they saw a chance here to get maximum equity. They were willing to give up cash at the time to increase the equity ratio. And they were entitled to show in defending that decision. And we were right. The stock price took off. We very carefully did not argue no harm, no foul, as the judge found. And that's attached to our reply brief in total, that argument. And in any event, the court eventually offered the plaintiffs a curative instruction. And they said we're satisfied and didn't ask for it. So it's literally waived and not before the court. On the other two issues, with respect to the majority shareholder, Coggins had 100% of the voting shares there. He was the absolute, ultimate majority shareholder. He owned all of the voting shares. And by that, controlled the stock. All of the Massachusetts cases, and the district court recognized there's no Massachusetts case directly on point here, are focused on the tyranny of the majority against the minority. And we don't have that here because we have the minority in control. Class A had total veto power over this merger. If they didn't like that $5 million premium, if they didn't like the exchange ratio, one third of them could have killed this merger of the outstanding shares. And they didn't. 91% of those that voted, voted in favor of the merger with full disclosure. On the other cases, every single one of the cases cited by the district court to support its disgorgement remedy involved another claim for presumed injury. There was conversion, there was a fraud claim, or it was like an unjust enrichment claim. We didn't have that here. In fact, the word disgorgement was not uttered by the plaintiffs in paper or in the transcript in open court until after the jury verdict came back and judgment was entered for the defendant. If you look at the pretrial statement, disgorgement is nowhere there. They talk about two categories of damages. The damages on the $5 million claim for the premium, and the damages for the stock price, the 22.5%. And there they call it recessory damages because the court was going to have to decide, if they had prevailed on that, do you value that claim at the time of the merger, at the time of trial, some other time. That was going to be the post-trial equitable decision. But there was no claim for disgorgement in this case. It was never asserted. Can you just clarify something for me that I should know but I'm not clear on? That some of the stockholders that are getting disgorgement voted in favor of the merger? No, the class was defined by the district judges. Those that voted no, those that affirmatively voted to abstain, were those that did not vote. It was about one-third of the class. So in sum, there was no basis, once the jury came back, on the state of these pleadings for the court to order any equitable relief. The IALTA example, the minute the attorney takes one penny from that account, that's a conversion. That's wrongful conduct. Here, the district court specifically found that a class B premium is not inherently wrongful. In fact, the evidence from the plaintiff's own expert was that they're commonly issued, and that he found them as high as almost $5 million on a case of this size, which is what it was here. So there was nothing inherently wrongful with having the premium, and therefore there should have been no basis to disgorge it because in all of the underlying cases, there was inherently wrongful conduct found by the court that allowed it to disgorge, and in those cases, return money to a plaintiff that was deprived of money. That's missing from these cases. So we think both on the Tucci rule and on the absence of any claim once the jury verdict came in and judgment was entered, the disgorging order should not stand, and we ask the court to vacate and remand the case for entry of judgment for defendants. Thank you. Thank you, Your Honor. I'd just like to say this was an unusually good argument from both sides. It's more of a pleasure to be a judge when we get good arguments from counsel. Thank you. We appreciate it. I join Judge Luce's statement. Thank you, Your Honor.